UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SHERYL ANN BAIRD                                   CIVIL ACTION

VERSUS                                             NUMBER: 13-0825

CAROLYN W. COLVIN, ACTING                          SECTION: "R"(5)
COMMISSION OF SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 14, 16).

Sheryl Ann Baird, plaintiff herein, filed the subject application for SSI benefits on May 14, 2010, alleging disability as of April 27, 2010.  (Tr. pp. 107-110).  In a "Disability Report" that appears in the record, the conditions resulting in plaintiff's inability to work were identified as Hepatitis C, a herniated disc, porphyria cutanea tarda ("PCT"), memory problems, possible breast cancer, arthritis, emphysema, chronic obstructive pulmonary disease ("COPD"), hypertension, vascular disease, neck and shoulder pain, depression, and anxiety.  (Tr. pp. 122-129).  Plaintiff's application for SSI benefits was denied at the initial

level of the Commissioner's administrative review process on November 3, 2010.  (Tr. pp. 79-82).  Pursuant to plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on September 22, 2011 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 83-85, 27-54).  On November 7, 2011, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 10-26).  The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-7).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1.  [t]he ALJ improperly rejected the treating physician's records and opinions, did not explain why she assigned "little" and "some" weight to Dr. Prasad's opinion, did not identify what limitations she did incorporate into her findings, and did not comply with Newton v. Apfel's requirement that the ALJ address the six factors set forth in 20 C.F.R. 1527(d).

2.  [t]he ALJ's findings at steps 2 and 3.5 that the plaintiff had severe medically determinable impairments and a reduced light residual functional capacity require reevaluation because they are incoherent and inconsistent and require reevaluation.  The ALJ assigned great weight to the state agency medical and psychological consultant's opinions that the claimant's asserted impairments were not severe; yet the ALJ found the claimant's impairments severe.  The ALJ also did not explain how she arrived at her residual functional capacity assessment when she assigned great weight to the state's finding that there were no severe medically determinable impairments, yet also a reduced light residual functional capacity.

3. [t]he ALJ evinced bias by mistakenly implying the claimant was a substance abuser and that the substance abuse rendered the plaintiff not credible.

(Rec. doc. 14-2, pp. 1-2)

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1. [t]he claimant has not engaged in substantial gainful activity since April 27, 2010, the application date (20 CFR 416.971 *et seq.*).

2. [t]he claimant has the following severe impairments:  essential hypertension, chronic liver disease, osteoarthrosis and allied disorder (20 CFR 416.920(c)).  These are severe impairments within the meaning of *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) and the Regulations.

3. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except as follows:  limited to climbing ramps and stairs only frequently (1/3 to 2/3 of an eight-hour workday); and limited to occasionally (up to 1/3 of an eight-hour workday) climb[ing] ladders, ropes, scaffolds, and perform[ing] stooping.

5. [t]he claimant has no past relevant work (20 CFR 416.965).

6. [t]he claimant was born on January 17, 1962 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. [t]he claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. [t]ransferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. [t]he claimant has not been under a disability, as defined in the Social Security Act, since April 27, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. pp. 15, 16, 21, 22).

Judicial review of the Commissioner's decision to deny SSI benefits is limited to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

4

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. an individual who does not have a "severe impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct.

2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th  Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The medical records that were generated during the relevant time period[1]/ begin with those from the Slidell Memorial Hospital ("SMH") Emergency Department ("ED") where plaintiff presented herself with complaints of ear pain and bleeding on July 4, 2009. The clinical impression was otitis media and plaintiff was discharged home in improved condition with prescriptions for Cipro drops and tablets and Vicodin for pain.  (Tr. pp. 184-189).  Plaintiff returned to the SMH ED on July 21, 2009 with complaints of bilateral foot pain and sharp pain in the legs which was rated as a "6" on a scale of "1" to "10".  The clinical impression on this date was chronic back pain with sciatica.  Plaintiff was discharged home in stable condition with blood pressure medication and instructions to have her blood pressure, chronic neck and back pain, and gynecological problems checked at the appropriate clinics.  (Tr. pp. 190-195).

---

[1]/ Under 20 C.F.R. §416.912(d), the Commissioner is required to develop the medical history of an SSI claimant for at least twelve months prior to the month in which the application for benefits was filed unless there is reason to believe that development of an earlier time period is necessary.  As plaintiff filed her application for SSI benefits on May 14, 2010 and alleged a disability onset date of April 27, 2010, the relevant time period thus begins in April of 2009.

On August 27, 2009, plaintiff was seen at the Northshore Regional Medical Center ("NRMC") ED for complaints of a cough, an earache, headaches, and a sore throat. Testing was negative for influenza A and B and x-rays revealed no active cardiopulmonary disease. The assessment was musculoskeletal pain and COPD for which plaintiff was given Ultram, Prednisone, and Robitussin DM. (Tr. pp. 294-306). On October 19, 2009, plaintiff presented to the Bogalusa Medical Center ("BMC") for medication refills, not having taken her blood pressure medication for over a year. The impressions included anxiety, emphysema, bronchitis, lumbar disc disease with left-sided sciatica, fibroids and rheumatoid arthritis by history, and hypertension. Numerous tests were ordered and plaintiff was advised to quit smoking. (Tr. pp. 223-224). Plaintiff was seen again at BMC on October 27, 2009 for complaints of knots on the bottom of both feet. Further testing was ordered and plaintiff was prescribed Mobic and Darvocet. (Tr. pp. 225-231).

Plaintiff was next seen at the NRMC ED on December 22, 2009 for a fever, headache, nausea, and flank/abdominal pain of a few days' duration which was described as the worst pain possible. Following testing, the diagnosis was bronchitis and a urinary tract infection. Levaquin was prescribed. (Tr. pp. 279-293). On April 23, 2010, plaintiff was seen at the BMC Outpatient Clinic for her annual examination and for a refill of her Verapamil, not having taken the blood pressure medication that day. Complaints of constant lower abdominal pain were also voiced. A Pap smear was negative and additional testing was ordered. Later that same day, plaintiff was evaluated at the BMC Outpatient Clinic for pain "all over," ear problems, dizzy spells, and loss of consciousness. Even further testing was ordered. (Tr. pp. 219-222, 379-384, 516-521).

7

On April 29, 2010, plaintiff presented to the Ocshner Medical Center – North Shore ("OMC-NS") for treatment of a laceration to her lower leg that would not stop bleeding. Past medical history was positive for hypertension, COPD, a herniated disc, and PCT. The diagnosis was a small puncture wound to the left lower extremity; the wound was dressed and the bleeding was brought under control. (Tr. pp. 269-278). Plaintiff underwent a mammogram on May 10, 2010 which revealed a focal asymmetric density in the lower left breast for which further evaluation, including spot compression views and ultrasound, was recommended. X-rays of the chest demonstrated no radiographic evidence of acute cardiopulmonary disease. (Tr. pp. 204, 211-214, 218, 340, 396, 512, 515). Various other studies were performed on May 17, 2010. A whole body bone scan was normal as was an abdominal ultrasound. Reasons for those studies were respectively identified as bone and back pain and Hepatitis C. X-rays of the pelvis revealed a calcified uterine fibroid and similar studies of the lumbar spine showed moderate anterolisthesis of L5-S1 for which a CT scan or an MRI were recommended as better evaluative modalities. (Tr. pp. 205-207, 232, 308, 338, 397, 510, 511, 513).

Plaintiff returned to the BMC Outpatient Clinic on May 21, 2010 to obtain the recent test results and for follow-up care of her hypertension and chronic pain syndrome with her generalized pain being rated as an "8". Normal physical examination findings were noted throughout all bodily systems. Lisinopril was substituted for Verapamil and plaintiff was referred to pain management and was prescribed Tramadol. (Tr. pp. 209-210, 377-378, 508-509). MRI testing was performed at BMC on June 24, 2010. Results of that testing on the cervical spine were as follows: 1) some reversal of the normal cervical lordosis with

8

grade I retrolisthesis of C5 on C6 and minimal anterolisthesis of C2 on C3 and C3 on C4; 2) C5-C6 disc space narrowing/degeneration with disc bulge/uncovering and mild spinal canal stenosis with neural foramen stenosis, the left greater than the right; 3) multilevel neural foreman stenosis, more prominent at the C5-C6 level on the left, the C4-C5 level on the right, and the C3-C4 level on the left; and, 4) facet degenerative changes more prominent at the C3-C4 level on the left.  Studies of the lumbar spine demonstrated:  1) grade I/grade II anterolisthesis of L5 on S1 with degenerative disc changes but without significant spinal canal stenosis and with moderate to severe bilateral neural foramen stenosis; 2) mild degenerative disc changes at additional levels without more than mild inferior neural foramen narrowing/stenosis and without significant spinal canal stenosis; and, 3) moderate to severe L5-S1 severe degenerative changes with some fluid within the facet joints.  (Tr. pp. 370-373, 385-395, 405-406, 492-493, 495-506).

On July 6, 2010, plaintiff underwent CT scans of the pelvis and abdomen with and without contrast.  Studies of the pelvis revealed a large complex right adnexal cyst with a fluid level compatible with a hemorrhagic cyst as well as a calcified uterine fibroid but was otherwise negative.  The abdominal CT scan was negative.  (Tr. pp. 374-375, 401-404, 490-491).

On July 8, 2010, plaintiff completed the Administration's "Function Report-Adult" that is designed to elicit information about how her conditions limited her activities.  There, plaintiff indicted that she could not stand for more than fifteen minutes at a time and suffered from respiratory compromise due to musculoskeletal issues, Hepatitis C, emphysema, vascular disease, depression, and anxiety disorder, experiencing "good" days

and "bad" days.  An average day consisted of lying on the couch or bed and watching television or simply staring at the walls.  Plaintiff was able to feed her pets and take them outside but dressing took time due to her back and neck and she had to bathe rather than shower due to her knees.  She was able to prepare simple meals such as sandwiches, canned soups, and frozen dinners but on some days did not eat at all.  Plaintiff reported that she could perform a good deal of household chores on "good" days but had to rest every ten minutes.  She could go outside alone every three to four days, could ride in a car and ride a bicycle, and could drive.  Plaintiff could also go grocery shopping but had to use a scooter.  Hobbies included watching television but social contacts were limited due to depression.  On "bad" days plaintiff tried to avoid others at all costs.  Plaintiff was able to walk one hundred twenty-five feet before needing to rest ten minutes to one hour, was unable to climb stairs, and was challenged in lifting ten pounds.  Except for talking, understanding, and following instructions, all of plaintiff's exertional and non-exertional abilities were affected by her conditions.  Attention was limited to five to ten minutes, stress was handled poorly, and plaintiff became startled by the sound of running water in her head.  Visits with mental health practitioners and other specialists were pending. Plaintiff's medications at the time were Lisinopril, Lortab, Prozac, and unidentified stomach medicine.  (Tr. pp. 138-145).

On July 12, 2010, plaintiff underwent a consultative evaluation by Dr. Janet Higgins. Complaints at the time included a history of liver disease, shortness of breath and cough related to cigarette smoking, and "bumps" on her feet.  Plaintiff reported having last worked six years earlier in which she drove cars for an auction house in Slidell.  She had

completed the ninth grade and subsequently obtained a GED and had been treated at BMC where a diagnosis of Hepatitis C was made.  Plaintiff admitted to a past history of alcohol abuse, occasionally drank beer and wine, had a "poor" appetite, and had alternating periods of diarrhea and constipation.  Bumps were complained of under plaintiff's left wrist and feet which caused some discomfort and she occasionally had joint pain and stiffness. Plaintiff also complained of some nervousness and a vague complaint of low back pain was elicited from her but nothing suggestive of radicular pain.  Similarly, occasional neck pain was lacking a radicular component.   Additional complaints included several fainting episodes, loss of memory, some wheezing five years earlier and occasional shortness of breath, and sharp pain in the middle of the chest without radiation.  Plaintiff also reported receiving an informational handout on PCT but gave no history of profound rashes and denied any itching.   Plaintiff took Lortab and a blood pressure medication and had a prescription for Prozac but was not taking it.  Past history was positive for motor vehicle accidents and pain management clinic visits and for cigarette usage for thirty-five years.

Upon physical examination, plaintiff was oriented in all spheres and ambulated with no difficulty but had generalized shakiness, especially of the hands.   Plaintiff's face appeared red and flush and there was generalized livedo reticularis changes over the legs, the corpus of the body, and the arms and telangiectasias was noted over the chest and neck area.  She stood at 5'6" in height and weighed 127 pounds.  Plaintiff was noted to have no upper teeth and carious lower teeth.   There was no clubbing, cyanosis, or edema of the extremities but the left wrist had two cystic lesions, both feet had cystic lesions, and there were two firm areas under the surface of the right foot in addition to plantar warts and

other raised lesions resembling warts.  Dr. Higgins observed plaintiff's feet to be black with dirt and deformities were present that were suggestive of hammer toes.  Plaintiff had an active range of motion in the cervical and lumbar spine, was steady at station and during ambulation without use of an assistive device, the heel-and-toe maneuver was intact, and straight leg raising was negative in the sitting and supine positions.  Neurologically, grip strength, grasping, dexterity, and sensation were normal, the Romberg sign was negative, gait was normal, and plaintiff was able to walk on her heels and toes and tandem walk.  In terms of mental status, plaintiff was somewhat anxious about her liver disease, was not compliant with her medication, and based upon the appearance of her legs and feet, was thought to be possibly homeless.  Plaintiff was vague about her outpatient treatment for anxiety and depression.

A chest x-ray that was taken at the time revealed slight cardiomegaly but no evidence of active pulmonary pathology.  An EKG study demonstrated a heart rate of 76 and a possible metabolic wave in V5-V6 but was otherwise normal.  Based upon a review of those test results, other unidentified medical records, and the results of the physical examination, Dr. Higgins' diagnosis was as follows:  1) abnormal liver function studies; 2) Hepatitis C; 3) hypertension; 4) shakiness; 5) past alcohol abuse; 6) tobacco abuse; 7) plantar warts on both feet; 8) hammer toes; 9) anxiety and depression; 10) possible homelessness; and, 11) lumbago.  In summarizing plaintiff's conditions, the doctor noted that plaintiff had some complaints of mild neck and low back pain but those were not a prominent part of her history or complaints and there was nothing to suggest radicular pain or any loss of sensation or weakness.  Plaintiff had an appointment with a pain clinic

and did not bring her medications with her to the consultative evaluation, suggesting non-compliance and possibly lack of a steady home situation.  (Tr. pp. 233-243).

Plaintiff presented to the Allied Medical Center ("AMC") on August 17, 2010, signing authorizations providing for the use and disclosure of her medical information as well as a "Pain Management Agreement" and incorporated "Blood or Urine Test Agreement."  (Tr. pp. 323-324, 473-479).   The following day, plaintiff was seen at the OMC-NS ED complaining of an inability to sleep secondary to back pain.  Plaintiff was out of pain medication at the time but also related that the Ultram that had been prescribed to her was not effective.  Upon physical examination, decreased range of motion was noted for the back but there were no other adverse findings.  Plaintiff was given prescriptions for Darvocet and Robaxin and was discharged home in stable condition with instructions to follow-up with her primary care physician.  (Tr. pp. 259-268).

Plaintiff was next seen at AMC on August 19, 2010.  In conjunction with that visit, plaintiff completed a "Patient Pain Drawing" in which she indicated that she suffered from aching/stabbing pain down her spine, in the lower abdomen, and in the knees and feet; aching and numbness down the left leg; and, aching pain in the left wrist.  Medications at the time were reported as Lortab, Lisinopril, and possibly Soma and Xanax.  Although the attending physician's treatment note is by no means a model of clarity, it appears that plaintiff's neck was supple on physical examination with a reduced range of motion and some tenderness but no radicular pain.  Other findings of tenderness and positive straight leg raising at 90 degrees were noted.  Plaintiff was prescribed Xanax, Soma, and Lortab as well as a cervical pillow, a cane, a back brace, and a knee brace as needed for pain.  Plaintiff

was also subjected to drug screening on this date which was positive for opiates with a notation being made on the test result report that plaintiff had used old pain medication recently. (Tr. pp. 315-319, 366-367, 369, 465-466, 481-486).

On September 16, 2010, plaintiff returned to AMC and was said to be doing well clinically with no new acute symptoms and an improvement in her chronic pain with the use of pain medications without side effects. She had also been using moist heat, NSAID's, antacids, and other non-prescription modalities for pain relief. Plaintiff denied any liver dysfunction but admitted to recent alcohol consumption. The diagnosis was L-5 radiculitis. She was given prescriptions for Xanax, Soma, and Vicoprofen and was to avoid over-the-counter drugs like Tylenol and also alcohol. Liver function studies were to be re-checked in three weeks. (Tr. pp. 314, 364-365, 463, 480).

On September 22, 2010, plaintiff underwent a consultative mental status examination at the offices of David D. Clark, Ed.D. Presenting problems included Hepatitis C, a herniated disc, PCT, memory problems, possible cancer, arthritis, emphysema, COPD, hypertension, vascular disease, neck and shoulder pain, and depression and anxiety. Plaintiff was brought to the evaluation by a friend but she did possess a valid driver's license and cell phone and could read the office's disclaimer fairly well. She appeared to be very anxious and agitated and her hands shook most of the time but she made adequate eye contact, was characterized as cooperative, had unremarkable speech, hearing, and movement, and walked and sat normally. Plaintiff indicated that she recently began taking Lortab after being off all pain medication for the previous two years. She also took muscle relaxers, high blood pressure medication, and a sleep aide. Plaintiff reported having been

14

diagnosed with Hepatitis C which was supposed to be fatal but was not.  She also reported a diagnosis of emphysema several years earlier but smoked two packs of cigarettes per day and also suffered from PCT for which she was prescribed medication and was to attend follow-up visits every two weeks but had not been to in over a year.

Among the background information that was provided by plaintiff was having worked as a "local driver" for fifteen to twenty years as well as self-employment as a window washer, work at a kennel, and as a cashier at a thrift store.  Plaintiff stated that she had hurt her back ten years earlier while picking up heavy objects and that it continued to be problematic since that time.  She described multiple cysts, both internal and external, had not worked in six years, and had been living off the assistance of friends who supplied her with the aforementioned quantity of cigarettes.  She reportedly lived in a trailer with no electricity or running water, receiving energy from a neighbor via an extension cord and water in buckets.  Showering was done at a neighbor's house twice per week.  Plaintiff had lived alone for the previous two years but prior to that had lived with someone who tried to kill her several times.  She indicated that she spent her time watching television and talking to her dog and she reported no past mental health treatment.  Although Clark reported "no drug history", legal history was significant for "a couple of charges for possession of controlled medication" for which plaintiff had been fined $2,500.00 and was on probation at the time.  When asked if she could work, plaintiff responded in the negative, citing pain that was so bad that she could not walk or deal with the public.

In terms of mental status, plaintiff was believed to be borderline at best and an intellectual assessment was recommended.  Her lengthy employment as a driver was

suggestive of borderline to low average intelligence but her lifestyle appeared to be clearly limited.  Plaintiff was oriented to time, place, and person, memory for immediate and delayed recall of simple material was acceptable to average, and thought processes were difficult to follow, drifty, and confused.  She had trouble remaining focused and frequently got lost; affect and mood were depressed, tense, and highly anxious.  Relying on plaintiff's statement that she had worked as a driver for fifteen to twenty years, Dr. Clark believed that plaintiff had the capacity to understand, remember, and carry out at least simple instructions and to follow a routine without direct supervision.  However, whether she was actually capable of doing so was unknown given her lack of employment for several years and unacceptable living conditions.  It appeared to Dr. Clark that plaintiff had a minimal foundation to engage in substantial gainful work activity on a full-time basis based on plaintiff's claimed inability to work due to pain despite having a prescription for two months but not having it filled yet.  With pain relief, however, it was believed that plaintiff could to return to some form of her previous employment.  Dr. Clark's formal diagnosis was as follows:  Axis I – occupational problem (no employment in several years), adjustment disorder with mixed anxiety, and depressed mood; Axis II – rule out borderline intellectual functioning; and, Axis III – complaint of back pain which prevented employment and multiple other medical problems.  (Tr. pp. 248-250).

At a repeat visit to AMC on October 14, 2010, plaintiff was characterized as clinically stable and denied any new symptoms.  However, she had not taken her blood pressure medication in two days.  Plaintiff was reportedly using a cane, pain medications were helpful with no side effects, and liver function tests were all within normal limits.  She had

also successfully resisted the use of Tylenol and alcohol.  Plaintiff was given prescriptions for Xanax, Soma, and Vicoprofen.  (Tr. pp. 362-363, 461-462).  In an entry to the "Case Development Sheet" by Administration workers on November 3, 2010, it was reported that plaintiff's past work as a driver involved being taken by a van to a site where she would retrieve a car and drive it back to the auction house.  The job required no lifting, bending, crawling, or reaching, only standing and walking from one car to another and crouching to get into the cars.  (Tr. p. 257).

Plaintiff was seen again at AMC on November 11, 2010, having again forgotten to take her blood pressure medication that day.  She was again declared to be clinically stable and denied any new acute symptoms.  Her prescribed pain medications were still working without any adverse side effects and an increase in her Vicoprofen had been beneficial. Refills for Xanax, Soma, and Vicoprofen were written.  Plaintiff took a drug test that day which was again positive for opiates.  She also completed a form denominated "Patient Comfort Assessment Guide" in which she described her pain as aching, throbbing, shooting, sharp, and continuous, an "8" at its worst, a "3" at its best, and a "5" to "6" on average. Notwithstanding what had been recorded on the most recent treatment notes, plaintiff indicated that Xanax only provided her relief at a level of "3" and that the Soma and Vicoprofen only provided relief at a level of "4".  Side effects were almost non-existent but during the previous week, plaintiff's pain had reportedly interfered with her general activity and normal work to a significant degree and had interfered with her sleep, enjoyment of life, ability to concentrate, and relations with others to a moderate degree. (Tr. pp. 312-313, 336, 360-361, 454-455, 459-460).

17

Plaintiff's condition was essentially unchanged when she returned to Dr. Anil Prasad of AMC on December 9, 2010. At plaintiff's request, Norco was substituted for Vicoprofen and she was additionally given refills for Xanax, Soma, and Zestoretic (Lisinopril). (Tr. pp. 358-359, 456-457). No change to plaintiff's condition was noted on January 13, 2011 but she admitted to consumption of alcohol and the use of over-the-counter medications like Tylenol. Plaintiff was admonished about such use under the threat of being discharged from Dr. Prasad's care. Refills for Xanax and Soma were given as was a prescription for Vicoprofen in lieu of Norco. (Tr. pp. 356-357, 450-451). On February 3, 2011, plaintiff was still described as clinically stable with complaint areas being identified as the back, head, and knee. Dr. Prasad reported that plaintiff had heeded the earlier admonishment with respect to alcohol and Tylenol use and her liver function studies were within normal limits. Once again, however, plaintiff had failed to take her blood pressure medication. The diagnosis was L-5 radiculitis with some progress having been achieved. Refills were ordered on plaintiff's medications and she was to continue with other pain relief modalities. Drug screen results from that day were positive for opiates and benzodiazepines. (Tr. pp. 310, 334, 354, 355, 447, 448, 449, 470).

On March 3, 2011, plaintiff was seen again by Dr. Prasad and her condition was unchanged. Her blood pressure had even improved even though she was no longer on blood pressure medication. With medication, plaintiff rated her pain as a "5". Further refills for Xanax, Soma, and Vicoprofen were authorized. (Tr. pp. 352-353, 446). Plaintiff's status was essentially the same when she returned to Dr. Prasad on March 31, 2011. She was continued on her medication regimen and the use of heat/ice for pain relief. (Tr. pp.

350-351, 445).  Her pain was stable with no new acute symptoms when she was seen again by Dr. Prasad on May 31, 2011.  Unfortunately, other than describing plaintiff to be at a "standstill," the majority of the remainder of the doctor's treatment note is unreadable.  Her prescriptions were refilled.  (Tr. pp. 346-347, 419-420, 439).  On June 28, 2011, plaintiff continued to be "clinically stable" with no new acute symptoms and with relief from her prescribed pain medications which had no side effects.  Once again, her prescriptions were refilled.  (Tr. pp. 344-345, 417-418, 437-438).

When plaintiff returned to Dr. Prasad on July 26, 2011, her condition was essentially unchanged except that the doctor noted that her pain was at a level of "4" when she took her medication.  She had again not taken her blood pressure medication that day.  Plaintiff's medications were refilled and she was advised to get a primary medical doctor.  (Tr. pp. 414-416, 434-436).  By August 23, 2011, plaintiff's condition was effectively the same.  The AMC treatment plan identified her sole complaint as low back pain and the diagnosis was L-5 radiculitis with some progress having been achieved.  Plaintiff was to continue to use a cane, NSAID's, antacids, moist heat, and over-the-counter gels as needed and she continued in her efforts to obtain a back brace.  Her medications were refilled and she again tested positive for opiates and benzodiazepines.  (Tr. pp. 412-413, 425, 427, 431-432, 468).

On September 11, 2011, Dr. Prasad completed a "To Whom It May Concern" two-page checklist form that had been provided to her by plaintiff's attorney.  There, the doctor checked off the appropriate boxes on the form to indicate that plaintiff experienced low back pain and cramping in her legs on protracted standing/walking; that she experienced low back pain on protracted sitting; that virtually every day she had to recline as needed

for relief of low back pain, fatigue, and cervical pain; that on looking down for protracted periods, she experienced an exacerbation of cervical pain; that she would be unable to alternate sitting and standing throughout an eight-hour day without walking about or reclining; and, that standing, walking, and/or sitting for six hours per eight-hour day would likely cause her significant pain or exacerbate her condition.  Dr. Prasad further indicated that his answers to the foregoing questions would not have been different at any time during his course of plaintiff's treatment.  (Tr. pp. 408-409).

On September 12, 2011, plaintiff was evaluated by Licensed Professional Counselor John Strain pursuant to a self-referral for depression and anxiety.  Plaintiff expressed a dislike for waking up in the morning and was too scared to be around people or to leave her residence.  She related having been prescribed Prozac by a BMC doctor which she had never taken because her friends told her that it would make her suicidal.  Plaintiff also related attending a pain clinic due to degenerative disc disease and previous diagnoses of Hepatitis C, emphysema, and PCT.  Symptoms at the time of the evaluation included disinterest and a lack of motivation, interrupted sleep, frequent nightmares, fluctuations in appetite, a low energy level, memory problems, anxiety upon being away from home, panic attacks, and a faucet-like sound in her ears.  Plaintiff recalled a physically abusive upbringing with alcohol abuse by both parents.  She had first married at the age of sixteen, had her first child at the age of nineteen, and was ultimately married a total of three times, each relationship being abusive.  Plaintiff had dropped out of a school in the eighth grade and had worked in restaurants and on construction jobs, her last work being day labor six years earlier.  Some of plaintiff's issues were thought to be attributable to two traumatic

20

rapes which occurred at various times in her life. She lived alone and obtained electricity via an extension cord running from a neighbor's house. The diagnosis was major depression, moderate, rule out post-traumatic stress disorder ("PTSD"). No specific treatment plan is indicated. (Tr. pp. 525-527). Plaintiff returned to Dr. Prasad on September 20, 2011 and was described as clinically stable with continued management of her pain through the use of prescribed medication. Her prescriptions were again refilled. (Tr. pp. 492-430).

As noted earlier, a hearing *de novo* before an ALJ went forward on September 22, 2011. After the documentary exhibits were admitted into evidence, including a recently-compiled list of medications, plaintiff took the stand and was questioned by the ALJ. She testified that she had last worked as a driver for a car auction delivery company from 2004 to 2006 but that job was not full-time. Plaintiff had previously worked as a driver and supply deliverer for construction companies from 1991 to 1994, driving a pick-up truck and unloading heavy material. She had also worked in a sheet metal shop for the same company. Other work plaintiff had performed in the past was at a kennel but that was apparently done only sporadically. Plaintiff attributed her spotty work history in the recent past to pain in her back, neck, and hand; tumors and cysts on her leg and feet; emphysema; and, Hepatitis C. She also suffered from depression and anxiety disorder as had been diagnosed by a counselor whom she had seen once in the previous year. More frequent visits had not taken place because of the distance plaintiff would have to travel but a further appointment was in the process of being scheduled. The Xanax that had been prescribed to her was reportedly only helpful in making her sleep. (Tr. pp. 29-34).

21

The ALJ then questioned plaintiff about her history of alcohol use as had been reported to Dr. Higgins.  She testified to being only a social drinker, consuming more or less six beers in a week's time depending on the circumstances including the generosity of others.  Symptoms of depression and anxiety included a lack of energy, a lack of interest in activities and in others, nervousness, and a tendency to startle easily.   By and large, plaintiff's treatment for depression and anxiety was limited to the Xanax that had been prescribed by Dr. Prasad.  Plaintiff lived alone in a trailer which she owned where she had resided for the previous six years.  Electricity and water were furnished by neighbors and food was purchased with food stamps.  A typical day consisted of sitting or lying down to watch television and making something simple and cold to eat on "good" days.  Moist heat and a back brace had been recommended by Dr. Prasad but plaintiff lacked the funds to purchase the brace which was not particularly helpful in any event.  Dr. Prasad's office visits had been funded by way of loans from plaintiff's neighbors.  (Tr. pp. 34-40).

In terms of physical capabilities, plaintiff estimated that she could sit for anywhere from five to ten minutes to one to two hours but would then need to lie down for a couple of hours.   Standing was limited to five to ten minutes but was largely avoided due to back pain.  Walking was similarly limited to forty feet, the distance to plaintiff's mailbox, but sometimes that was too taxing and was thus attempted only every two to three days.  Even then, when walking such a distance was possible plaintiff would need to rest for a couple of hours.  Plaintiff testified to being provided with an inhaler at one point in time and to obtaining emergency room treatment on occasions on which she was unable to breathe. Ten pounds was the maximum weight that she could lift and carry but even that was

challenging on "bad" days which she estimated occurred at a rate of three to five days per week and on which she spent the majority of the day lying on the couch.  With prescribed medication, plaintiff's level of pain was "5" to "6", perhaps as low as "4" on "good" days.  In response to the ALJ's specific question, plaintiff disputed the existence of any positive drug test results as had been recorded by Dr. Prasad.  (Tr. pp. 40-44).

Upon being tendered to her attorney for further questioning, plaintiff testified to numbness, pain, and trembling to her hands in addition to a knot.  Those difficulties resulted in manipulative deficits.  Overhead and normal reaching were painful as were bending, crawling, and stooping.  She suffered from neck pain that rendered movement of her head painful and caused occasional shooting pain down her arms and legs.  Pain in the lower back radiated down the hips and into the left leg with a feeling of numbness.  Muscle spasms were also present and plaintiff was noted to have in her possession the cane that had been prescribed by Dr. Prasad.  Cysts on plaintiff's feet made wearing shoes painful. Plaintiff also testified to pain and swelling to her stomach which occurred three times per week or more.  Memory and concentration were reported as limited.  (Tr. pp. 44-49).

Karen Harrison, a VE, was the next witness to take the stand.  After the ALJ effectively conceded that plaintiff had no substantial gainful activity earnings in the previous fifteen years, the ALJ posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who was limited to light-level work with only occasional climbing of ladders, ropes, and scaffolds, occasional stooping, and frequent climbing of ramps and stairs.  With those limitations in mind, the VE testified that the individual described in the hypothetical question could work as a janitor, with

23

significant numbers of such a position existing in the national and local economies.   In addition, the described individual could function as a hand packager and vehicle cleaner.   A second hypothetical question was then posed to the VE which assumed an individual of plaintiff's age, education, and work experience who was limited to sitting four hours per eight-hour workday; lifting and carrying a maximum of ten pounds; sitting for two hours at a time followed by a thirty-minute break after each hour of sitting; less than occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; and, who may miss three or four days of work per month.   With that profile in mind, the VE testified that the described individual would be unable to work.   (Tr. pp. 49-53).   After being tendered to plaintiff's counsel for further questioning, the VE testified that occasional deficits to the hands due to tremors, defined as 1/3 of the time, would render the identified jobs unperformable.   (Tr. pp. 53-54).   Following the hearing, an appointment with a psychiatrist was scheduled for November 23, 2011 through the Florida Parishes Human Services Authority.   (Tr. p. 523).

Plaintiff challenges the ALJ's decision to deny her SSI benefits on three grounds. First, she argues that the ALJ improperly rejected the records and opinions of her treating physician, Dr. Prasad; that the ALJ did not explain why she assigned little weight to some of Dr. Prasad's opinions while assigning some weight to others; that the ALJ failed to identify which of Dr. Prasad's limitations she incorporated in her residual functional capacity ("RFC") assessment of plaintiff; and, that the ALJ failed to perform a detailed analysis of Dr. Prasad's views using the six factors set forth in 20 C.F.R. §404.1527(d).[2/]

---

[2/] The six factors that are considered in weighing medical opinions that were formerly set forth in 20 C.F.R. §404.1527(d) can now be found in §404.1527(c).  That Regulation, however, pertains to the adjudication of

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of <u>any</u> physician when the evidence supports a contrary conclusion.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled in part on other grounds by Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080 (2000)).   A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown.  *Newton*, 209 F.3d at 456 (citing *Brown v. Apfel*, 192 F.3d 492, 500 (5th Cir. 1999) and *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984 (1995)).   Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion.  *Newton*, 209 F.3d at 456; *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).   The Regulations require an ALJ to perform a detailed analysis of a treating physician's views under the criteria set forth in 20 C.F.R. §404.1527(c)(formerly §404.1527(d)) <u>only</u> in the absence of controverting medical evidence from other treating and/or examining physicians.  *Newton*, 209 F.3d at 453.

A review of the ALJ's written decision of November 7, 2011 reveals the following: After making an assessment of plaintiff's RFC, the ALJ methodically discussed the evidence that she had considered in making that determination, starting first with the testimony that

---

applications for Disability Insurance Benefits ("DIB").   The appropriate counterpart for SSI benefits applications like plaintiff's is 20 C.F.R. §416.927(c).

plaintiff gave at the administrative hearing.  (Tr. p. 17).  In doing so, the ALJ observed that

plaintiff had brought a cane for her use at the hearing which had been prescribed by Dr.

Prasad on an "as needed" basis.  (*Id.*).  However at roughly the same time as Dr. Prasad's

prescription, plaintiff had been evaluated by Dr. Higgins who noted that she ambulated

with no difficulty without the use of an assistive device and had no radicular pain, loss of

sensation, or weakness.  (*Id.*).

Next, the ALJ turned to the documentary evidence that was admitted in the

administrative proceedings below, starting with the records of plaintiff's treatment at BMC,

the results of diagnostic tests that had been conducted in May and June of 2010, and the

findings from the consultative evaluations that were performed by Drs. Higgins and Clark

in July and September of 2010, respectively.  (Tr. pp. 17-18).  The ALJ then discussed Dr.

Prasad's treatment notes beginning in August of 2010 and ending in September of 2011

including the "To Whom It May Concern" checklist form that was completed by the doctor

on September 11, 2011.  (Tr. pp. 18-19).  When weighed against the objective evidence of

record, the ALJ found that plaintiff's allegations were simply not credible to the extent

alleged.  (Tr. p. 19).

In according diminished weight to plaintiff's subjective complaints, the ALJ cited the

various activities plaintiff admitted that she was capable of in the Function Report, a proper

consideration in the Social Security context.  *Vaughn v. Shalala*, 58 F.3d 129, 131 (5th Cir.

1989).  Plaintiff's sporadic work history prior to the alleged onset date also raised the

spectre of whether her continued unemployment was due to medical impairments as

opposed to other factors which had little to do with her ability to engage in work-related

activities.  (Tr. p. 20).  Other factors bearing on plaintiff's credibility were her testimony as to whether or not she had ever tested positive for drug use and her testimony and reports to treating and examining doctors about alcohol use.  (Tr. p. 20).  Great weight was given to the State agency medical examiners' findings and those of Dr. Higgins as being more adequately supported by the objective findings and the record as a whole.  (Tr. p. 20).

The opinions expressed in Dr. Prasad's "To Whom It May Concern" letter, on the other hand, were properly accorded little weight by the ALJ.  (Tr. p. 20).  The form itself is unaccompanied by any contemporaneously-recorded, medically acceptable findings and is thus entitled to little weight on that basis alone.  *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).  The use of such checklist forms is generally viewed with disfavor when the forms are not adequately supported by any narrative citations to clinical finds.  *Haynes v. Astrue*, No. 11-CV-2289, 2012 WL 3860467 at *15-16 (E.D. La. July 23, 2012), *adopted*, 2012 WL 3863171 (E.D. La. Sept. 5, 2012), *aff'd*, 519 Fed.Appx. 258 (5th Cir. 2013)(and cases cited therein); *Morris v. Astrue*, No. 08-CV-4105, 2010 WL 497748 at *10 (E.D. La. Feb. 1, 2010).  In addition to the lack of any supporting findings, the timing of the checklist form in relation to the administrative hearing also casts doubt on its evidentiary value.  *Haynes*, 2012 WL 3860467 at *15-16.  That having been said, the ALJ gave some weight to the objective findings that could be gleaned from Dr. Prasad's contemporaneous treatment notes as well as those from the attending physicians at OMC-NS who treated plaintiff for chronic back pain and various other conditions.  (Tr. p. 20).  With the limitations resulting from those conditions in mind, the ALJ assessed plaintiff as being capable of a range of light work that was further limited by restrictions on climbing and stooping.  To the extent that

plaintiff complains that the ALJ failed to perform a detailed analysis of Dr. Prasad's views under the criteria set forth in 20 C.F.R. §416.927(c), she was required to do so <u>only</u> in the absence of controverting medical evidence from other treating and/or examining physicians. *Newton*, 209 F.3d at 453. Dr. Higgins, an examining physician, provided such controverting evidence. That being the case, the ALJ was under no duty to perform the detailed analysis or to recontact Dr. Prasad to seek further clarification of the checklist form. *Holifield v. Astrue*, 402 Fed.Appx. 24, 27 (5th Cir. 2010)(citing *Newton*, 209 F.3d at 453). This challenge is without merit.

By way of her second challenge to the Commissioner's decision, plaintiff attacks the ALJ's finding at step two of the §416.920 analysis that she did not suffer from a severe mental impairment as well as the ALJ's RFC assessment which failed to include the manipulative limitations that plaintiff testified to at the administrative hearing. As respects the step two attack, plaintiff argues that because Dr. Clark, whose opinions were subsequently cited by the state agency psychological consultant and were later given great weight by the ALJ, diagnosed plaintiff as suffering from various conditions, that those conditions were severe and should have been acknowledged as such by the ALJ.

The mere existence or diagnosis of a condition, however, does not establish its severity or demonstrate that it is disabling within the meaning of the Social Security Act, the ultimate issue that is entrusted to the Commissioner under 20 C.F.R. §416.927(d)(1). *Randall v. Astrue*, 570 F.3d 651, 658-59 (5th Cir. 2009); *Haines v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). Notwithstanding the diagnoses that he made, Dr. Clark found that plaintiff's lengthy employment as a driver for an auction house was suggestive of borderline to low

average intelligence and that her memory for immediate and delayed recall of simple

material was acceptable to average.  In further recognition of plaintiff's work history, Dr.

Clark believed that she had the capacity to understand, remember, and carry out at least

simple instructions and to follow a routine without direct supervision.  Accepting at face

value plaintiff's cited inability to work due to pain, Dr. Clark noted that plaintiff had a

prescription for pain medication but had not filled it in two months.  The Court recalls that

under the medication regimen that had been prescribed by Dr. Prasad, plaintiff's pain was

reduced to a manageable level of a "4" or "5" and she was declared to be clinically stable.

The Regulations require a claimant to follow the treatment prescribed by her physician, 20

C.F.R. §416.930, and a condition that can reasonably be remedied or controlled by

mediation is not disabling.  *Lovelace v. Bowen*, 813 F.3d 58, 59 (5th Cir. 1987).  Plaintiff

reported to Dr. Clark that she had no mental health treatment history and that she was not

taking any medication for a mental condition.  Under these circumstances, the Court cannot

say that the ALJ's step two finding was an incorrect one.  More importantly, inasmuch as

consideration of plaintiff's application for SSI benefits proceeded past step two of the

§416.920 sequential analysis and was not summarily denied at that step based on the fact

that she did not suffer from a severe impairment, plaintiff's argument provides no basis for

disturbing the Commissioner's decision.  *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987);

*Chaparro v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Wagner v. Astrue*, No. 08-CV-0519,

2010 WL 546739 at *7 (E.D. La. Feb. 12, 2010).

The other aspect of plaintiff's second challenge is that the ALJ's RFC assessment

failed to include the manipulative limitations that plaintiff testified to at the administrative

hearing.   The short answer to this argument is that ". . . subjective testimony and complaints do not take precedence over objective medical evidence."  *Wagner*, 2010 WL 546739 at *9.  When examined by Dr. Higgins on July 12, 2010, plaintiff had normal grip strength, grasping, and dexterity.  (Tr. p. 240).  As noted by the government, even Dr. Prasad's checklist box form, completed just eleven days before the administrative hearing, indicated that plaintiff had no progressive numbness, weakness, or loss of dexterity upon sustained or repetitive use of her hands.  (Tr. p. 408).  At no time did Dr. Prasad include any manipulative limitations in any of his contemporaneous treatment notes, a telling omission. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan*, 58 F.3d at 131.  Reversible error is not present here.

Plaintiff's third and final challenge to the Commissioner's decision is that the ALJ evidenced bias against her by mistakenly implying that she was a substance abuser and that the substance abuse rendered her not credible.   Plaintiff argues that the ALJ improperly placed "great weight" upon her positive drug test results in finding her not disabled because Dr. Prasad had prescribed the very drugs that plaintiff tested positive for.

In addressing this challenge, the Court recalls that the responsibility for weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance.  *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).  The task of evaluating a plaintiff's credibility is one that is particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court.  *Harrell*, 862 F.2d at 480.

Statements made by an ALJ ". . . that are critical or disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge unless they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Brown v. Apfel*, 192 F.3d 492, 500 (5th Cir. 1999)(quoting *Liteky v. United States*, 510 U.S. 540, 555, 144 S.Ct. 1147, 1157 (1994))(internal quotations omitted).

In finding that plaintiff's subjective allegations were not credible to the extent alleged, the ALJ admittedly cited her hearing testimony that she had never failed a drug test which was at odds with the records of Dr. Prasad which contained positive drug  test results on a number of occasions.  (Tr. p. 20).  That inconsistency, however, was but one of a number of similar instances that were noted by the ALJ in finding her subjective complaints to be unworthy of complete credence.  Others included the activities that plaintiff acknowledged that she was capable of in the Function Report that she completed despite her statements to the contrary; her sporadic work history which raised the question as to whether her continued unemployment was truly the result of medically determinable impairments; her reported inability to obtain mental health treatment due to the distance involved despite being seen at other healthcare facilities that were similarly situated; her purported need for a cane at roughly the same time as Dr. Higgins' findings that she ambulated with no difficulty and had no radicular pain or loss of sensation of weakness; and, her testimony about the use of alcohol which conflicted with her admission to Dr. Higgins and Dr. Prasad's threat to discharge her from his care based upon such use. (Tr. pp. 17-20).  A fair reading of the ALJ's decision readily reveals that plaintiff's subjective

complaints and testimony were discounted not because she was believed to be a substance abuser, but because of a lack of objective support.  On this front, the ALJ did not err.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this ___6th___ day of _____May_____, 2014.

_____
     MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE